UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|                          |   |                              |
|--------------------------|---|------------------------------|
| **UNITED STATES OF AMERICA** | : | Criminal Number:             |
|                          | : | MAG. No. 07-422-M-01         |
| v.                       | : |                              |
|                          | : | VIOLATIONS: 18 U.S.C. § 371  |
| **SHERI F. ADAMS**       | : | (Conspiracy)                 |
|                          | : |                              |

**INFORMATION**

The United States Attorney informs the Court that:

**COUNT ONE**

**Conspiracy**

Introduction

At all times material to this Information:

1. DANA E. MARSHALL ("MARSHALL") was employed by the District of Columbia as a correctional officer for the District of Columbia Department of Corrections ("DCDOC") in Washington, D.C.  MARSHALL was assigned to the Central Detention Facility (CDF), sometimes referred to as the D.C. Jail, located at 1901 D Street, SE, Washington, D.C.

2. MARSHALL primarily worked in the culinary area of the CDF and was responsible for enforcing the established rules of the CDF.  One of those rules prohibited bringing contraband into or possessing contraband in the facility including, but not limited to, cash, tobacco, narcotics, and electronic devices.

3. MARSHALL had been trained regarding the contraband prohibition.  MARSHALL and defendant SHERI F. ADAMS ("ADAMS") knew that bringing contraband into the CDF, possessing contraband in the CDF and giving contraband to an inmate in the CDF was in violation of

MARSHALL's official duty as a correctional officer.

  4. ADAMS was an acquaintance of MARSHALL'S. ADAMS resided in an apartment at XXXXXXXXXXX, Washington, D.C.

### The Conspiracy and its Objects

  5. From between in or about October, 2006 and on or about August 28, 2007, the exact dates being unknown, in the District of Columbia and elsewhere, MARSHALL and ADAMS did knowingly combine, conspire, confederate and agree with each other and others known and unknown, to commit the following offense against the United States:

> Bribery of a Public Official, that is, MARSHALL, ADAMS, and others conspired and agreed that MARSHALL, a public official, would directly and indirectly, corruptly demand, seek, receive, accept and agree to receive or accept anything of value personally or for any other person in return for being induced to do an act in violation of his official duty, in violation of Title 18, United States Code, Section 201(b)(1)(C)).

### Purposes of the Conspiracy

  6. It was a purpose of this conspiracy for defendants MARSHALL and ADAMS to enrich themselves by corruptly receiving money and other items of value from persons associated with inmates at the CDF, directly and indirectly, in return for MARSHALL bringing contraband items into the CDF and delivering those items to inmates.

### Manner and Means Used to Carry Out the Conspiracy

  The conspiracy was carried out through the following manner and means, among others:

  7. MARSHALL came into contact with inmates at the CDF as a correctional officer working at the CDF.

8. Inmates or their contact in the community would call ADAMS' cellphone to arrange delivery of and payment for contraband items.

9. ADAMS would arrange a meeting with an inmate's contact in the community to receive payment and, in some cases, items of contraband. The conspirators would purchase cigarettes to be smuggled into the CDF, but all other items of contraband were provided to ADAMS by the inmate's contact person in the community.

10. ADAMS would then meet with MARSHALL and provide to him the cash and items of contraband to be smuggled into the CDF by MARSHALL. Throughout the conspiracy, these items of contraband included, but were not limited to, cash, cigarettes, cellphones and controlled substances.

11. MARSHALL would conceal the items of contraband on his person and/or in his belongings and/or in items he was carrying and bring them into the CDF, wherein MARSHALL, either directly or through others, would deliver the contraband to the inmates who requested the item.

## Overt Acts of the Conspiracy

12. In furtherance of the conspiracy and to accomplish the objects thereof, MARSHALL and ADAMS, committed the following overt acts, among others, within the District of Columbia, and elsewhere:

(a) In or about July, 2007, MARSHALL met with an inmate in the CDF who, unbeknownst to MARSHALL, was a cooperating witness ("CW1") working with the Federal Bureau of Investigation ("FBI"). MARSHALL agreed to bring cigarettes and cash into the CDF for CW1. CW1 told MARSHALL about his contact outside the CDF, who was actually an FBI Undercover Employee ("UCE"). MARSHALL instructed CW1 to call ADAMS to arrange for the delivery to

her.  CW1 obtained ADAMS' phone number from another inmate.

(b) In or about July, 2007, CW1 spoke with ADAMS on the telephone and told ADAMS about his contact, the UCE, that the UCE was CW1's friend and would be providing cash and other items of value in return for ADAMS and MARSHALL arranging to smuggle contraband into the CDF.

(c) On July 24, 2007, the UCE contacted ADAMS via telephone.  During the call, the UCE and ADAMS discussed the process by which the UCE could set up and pay for the smuggling of contraband to CW1.  ADAMS listed for the UCE the services offered as well as the prices for those services.  For example, when asked how much she charged for various items, ADAMS replied "candy 200, cigarettes, a carton 200, and a cell phone is 250."  "Candy" was slang for controlled substances.  ADAMS told the UCE that the inmate in the jail would get the cigarettes two days after they met and payment was made.

(d) On July 27, 2007, the UCE and ADAMS spoke via telephone.  During the call, the UCE and ADAMS negotiated the amount of the bribe that ADAMS and MARSHALL would be paid for smuggling cigarettes and cash to CW1.  The UCE asked ADAMS to smuggle in $100 in cash to CW1, in addition to a carton of cigarettes.  ADAMS responded that she normally charged an extra $50 for smuggling cash, but offered to charge only $25 after the UCE complained that he was not advised about an additional charge to smuggle cash into the CDF.

(e) On July 31, 2007, the UCE and ADAMS spoke via telephone.  During the call, the UCE and ADAMS made plans to meet to complete the transaction on August 2, 2007.

(f) On August 2, 2007, the UCE and ADAMS met in the parking lot of McDonald's at the intersection of New York Avenue and First Street NE, Washington, DC. During the meeting, the UCE provided to ADAMS $325 in cash in the following denominations: six $50 bills, one $20 bill,

and one $5 bill.  Of the money provided to ADAMS, $225 was to be used to purchase a carton of cigarettes that would be delivered to CW1, with the remainder of the money (approximately $180, depending on the exact cost of the cigarettes) serving as a bribe for MARSHALL and ADAMS.  The bribe was in return for ADAMS and MARSHALL delivering $100 in cash and a carton of cigarettes to CW1.

    (g)  On August 6, 2007, MARSHALL delivered ten packs of cigarettes and two $50 bills to CW1 inside the CDF.  The cigarettes MARSHALL delivered to CW1 were in their original packaging.  Of the 10 packs MARSHALL provided to CW1, four pairs were taped together with duct tape; the remaining two packs were loose.  On August 7, 2007, CW1 provided to FBI agents two $50 bills and one of the packs of cigarettes that MARSHALL smuggled in for CW1.  The serial numbers of the two $50 bills matched those of two of the bills that UCE provided to ADAMS on August 2, 2007.

    (h)  On August 17, 2007, The UCE and ADAMS met in the parking lot of McDonald's at the intersection of New York Avenue and First Street in Northeast Washington, DC.  During the meeting, The UCE provided to ADAMS one $50 bill, a 32" LCD television that was still in its original packaging, and an Ipod Nano.  The UCE advised ADAMS that the television set was stolen property.   The $50 and LCD television set were a bribe payment for ADAMS and MARSHALL for smuggling the Ipod and a carton of cigarettes in to CW1.  ADAMS told the UCE that she was keeping the television set for herself.

    (I)  After meeting with the UCE, ADAMS returned to her residence at 601 Edgewood Street NE.  There, she was observed and photographed meeting with MARSHALL.  FBI agents then observed ADAMS and MARSHALL unload the LCD television, still in its original packaging, from ADAMS' car.  MARSHALL carried the television set up the ramp and into ADAMS' apartment

building, while ADAMS walked beside him.

(j) On August 19, 2007, MARSHALL told CW1 that he had "stuff" to deliver to CW1. CW1 understood this to mean the Ipod and another carton of cigarettes, per the second transaction between the UCE and ADAMS.

(k) On August 20, 2007, MARSHALL and CW1 discussed the LCD television that the UCE gave to ADAMS. MARSHALL told CW1 that ADAMS would keep that set. However, MARSHALL indicated that he wanted a second television set for himself. MARSHALL also told CW1 that he would deliver everything, meaning the Ipod and a carton of cigarettes, to CW1 the following day.

(l) On August 21, 2007, CW1 placed a call to MARSHALL's cellphone and spoke with MARSHALL. During the call, MARSHALL told CW1 he would see CW1 the next day, and would deliver the items to CW1 at that time.

**(Conspiracy, in violation of Title 18, United States Code, Section 371)**

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY


_____
THOMAS J. HIBARGER
Assistant United States Attorney
555 4th Street, N.W., Room 5237
Washington, DC 20530
Bar Number 413224